Good morning, Your Honors. May it please the Court. Craig Countryman on behalf of the petitioner, Peter Waswa. Your Honors, this is an asylum case in which the immigration judge found and the Board of Immigration Appeals assumed that Mr. Waswa had suffered past persecution in Uganda at the hands of the Museveni government. Now, as the Court knows, that gives rise to a presumption of a well-founded fear of future persecution that if Mr. Waswa were returned to Uganda that he would again face persecution at the hands of the Museveni government, which is still in power. And the agency's analysis of whether the government rebutted the presumption presents three issues in this case. The first is a threshold issue of which of the agency's opinions the Court should review. The second is regardless of which opinion the agency, the Court should review whether the agency conducted the required legal analysis, in particular, an individualized determination of whether the government had rebutted the presumption. And the third issue is even if the agency conducted the proper legal analysis, whether its factual findings were supported by substantial evidence. I'm going to focus on the first two issues in my argument today. And starting with the first issue, so we would submit that the Court should only review the opinion of the Board of Immigration Appeals in this case. Everyone agrees that the standard is when the Board writes an opinion that this Court only reviews the Board's opinion unless the Board expressly adopts all or part of the immigration judge's reasoning. And we'd submit that here there was no express adoption by the Board. It does have language, though, that we've similar to what we've relied on. It says we find no reason to disturb the I.J.'s decision. And then later it says the I.J.'s decision is supported by the record. So it's clearly relying on the I.J.'s decision. And normally in that situation we'll look at both. Why shouldn't we do that here? I guess the question is whether that language is ambiguous. And so I wasn't able to find a case that was directly on point. But I do think that that language implies one of two things. Either the Board could be saying we agree with the immigration judge's result, or it could be saying we agree with all of the immigration judge's reasoning and we're adopting the reasoning. And I think here it's ambiguous which of those two possibilities the Board was referring to. It talks about the immigration judge's decision and agreeing with the immigration judge's conclusion. I don't think we've ever said that it's necessary for the BIA to be express, that it's adopting the I.J.'s decision as its own. We look at the language the BIA used. Is there a case that requires some specific statement from the BIA? I think the best there is, Your Honor, is the cases that say that there has to be express adoption. And I think that this circumstance What cases say there have to be express, using that term in particular? We cite it in our brief, Your Honor. The Hussaini v. Gonzalez case, cited at page 21 of our brief, 471 F3D 953. And so we submit here where there's ambiguity that that's the antithesis of express adoption. I think that oftentimes this issue doesn't get fully discussed in the Court's opinions, and so there is a little bit of unclarity in the law regarding what exactly is required for express adoption. But I think here there are several things in the Board's opinion that would suggest it wasn't expressly adopting. The first is the fact that the Board explicitly says it's conducting de novo review. The government before the Board had just asked it summarily to affirm. The Board didn't do that. It conducted de novo review. It wrote its own opinion. And it, in particular, only discussed a subset of the evidence before the immigration judge and what the immigration judge had discussed. And I think here kind of which opinion you review affects the second question, which is whether the agency did its job in conducting the individualized determination. Because if you look at the Board's opinion, the Board just relies on two things only. First, it talks about the 1997 country reports and cites that country report to say there's an amnesty still in place that may cover Mr. Waswa. The second thing is that it also cites discussion in the 1997 country report that high- and low-level combatants had successfully returned to Uganda. So what difference does it make? Let's assume that we think that we can look at both opinions. What difference would it make if we didn't agree with that? I mean, the BIA relies on the 1997 report. The IJ relies on the 1997 reports and other reports. But the BIA makes the statement that it's, in general, it's supported by the record. So what difference does that make then? Wouldn't we look at the record to see if the BIA was correct? I think we could look at the record. I mean, I think probably the best thing to do would be to remand to the BIA and say that it needs to make the individualized determination. So if you're just looking. What's wrong with it relying on the 1997 report, which said there's a presidential amnesty in place? So a couple things. I think one is the failure to mention the evidence that's specific to Mr. Waswa. So there were two key facts here specific to him. The first was his testimony that his children told him, in particular, in 2005, that the military was still looking for him. And so that suggests that whatever the country reports might generally say about conditions in Uganda, the military is still looking for Mr. Waswa. Does he have a reason why they would single him out as opposed to other people? You know, the record's not clear on that. He was a boxer in Idi Amin's military. And so in his testimony, he discussed that, you know, that was a pretty prominent position within Uganda. Idi Amin himself was a boxer. And so, you know, it was a pretty prominent thing over there. And a reason why he might be singled out or why his return might be noticed, as opposed to just some other former combatant returning to Uganda. The second thing that the board doesn't mention at all, and actually neither does the immigration judge, is the fact that Mr. Waswa testified that his sister and brother-in-law were murdered by the Museveni government in Uganda at some time in the past, but after Mr. Waswa had come here, so at least after 1990. You know, the total failure of the board to discuss that at all, or the immigration judge actually mentions it in his findings of fact, but then when he's discussing the substantive analysis of whether the presumption's been rebutted, doesn't consider that at all. There's changed circumstances. Let's assume now that, so I understand your argument about why it makes a difference between looking at the BIA and the IJ decisions. Let's assume we're looking at both of them. Why wasn't there substantial evidence to support the IJ's determination? So I think the first is just the IJ's a bit turned around on what exactly the testimony is about what the children told Mr. Waswa in 2005. I looked at the testimony and it did seem ambiguous. So was the IJ's conclusion unreasonable? I think the main thing was the IJ just doesn't connect the dots. So earlier in the IJ's opinion he says that he's finding that Mr. Waswa testified credibly in all material respects regarding his fear of future persecution. That's at 8133. But then when he's discussing the testimony, the immigration judge says, well, you know, Mr. Waswa testified that the children, you know, told him this, but then he earlier testified that he hadn't talked to them because they were young. But it's not clear whether the immigration judge thinks that Mr. Waswa had recanted or whether he's saying that there's some kind of inconsistency and he's finding a credibility problem. I don't think he could be finding a credibility problem based on the earlier statement in the opinion where he says he's finding he testified credibly in all material respects. And so I think it's more of just a failure to connect the dots of what exactly is the immigration judge finding there. I gather that you aren't arguing with the fact that conditions have changed. I think with respect to Mr. Waswa, personally, we would argue with that. I mean, certainly there's no... No, no, no. I guess what you're saying, I gather, conditions changed, but Mr. Waswa is an exception because he was particularly identified as somebody who should be killed. I think, yes, that's one aspect. I gather that's what you're saying. And in order for us to follow that argument or agree with it, accept it, don't we have to find something in this record that says to us what you say is true? I think that's just part of my argument. So I think the two facts, that the children stay in the military still looking for him and the sister and the brother-in-law being murdered, that suggests he's being... Yeah, but don't we win the sister and brother-in-law in the conditions under which they were murdered? That's true. And I think on that point, the record's a bit unclear on when exactly it was. We know it was after he came here. It's all we've got, and it's clear enough to make some assumptions, for a court to make some assumptions. I mean, I think it's definitely clear enough that it should be part of the analysis, and the fact that the agency didn't analyze at all the impact of that testimony on his claim is error and shows that either it legally erred or its findings aren't supported by substantial evidence. I think the other problem is the analysis of the country reports, and so we talk about this a little bit in our brief. The immigration judge thought that there was an amnesty in place covering Mr. Waswa, and specifically cited the 2000 amnesty law that's in effect in Uganda that's mentioned in the latest country reports. When you look at the text of the law, which we quote at page 29 of our brief, that only covers post-1986 acts, all of the acts for which Mr. Waswa was persecuted and for which he might be persecuted again occurred before. Was that argued to the IJ or the BIA, that issue? The specific argument was not made to the agency, but the general claim of appealing the asylum and withholding and protection of the convention against torture claims was made, and the government concedes at footnote 23 of its brief that this court can consider new arguments that support the same claim that was raised before the BIA. But we see the law. We have no interpretation, no argument. We don't know. We're not familiar with Ugandan law. I mean, I see what the words say, but as you know, the words in our statute don't always mean what they seem to say on their face. That's true, although, I mean, the Supreme Court certainly says that we should, you know, take the plain meaning of statutes, and I think here the statute, the Ugandan statute, couldn't be plainer, that it only applies to post-1986 acts. And then what do we do about the 1997 report that says there was a presidential amnesty, et cetera, and gave some examples, including people who had committed acts pre-1986? Right. So two things on that. First, there's no evidence in the record that that amnesty is still in effect. Is there any evidence that it isn't in effect? I think one indicator of that would be that the presidential amnesty is not mentioned in the 2007-2008 country reports. They just mention the 2000 law. I think the second point is that even if there's not evidence, it's the government's burden to rebut the presumption of a well-founded fear. And so I think the absence of evidence suggests that the presumption has not been rebutted. So there is evidence that there was an amnesty starting in 1997. There's no evidence that it was repealed or superseded, but there is evidence that it's not mentioned. So you think not mentioning in the 2007-2008 report would require the government to rebut an inference of it having been superseded? Is that the argument? I think it would, Your Honor, yes. With respect to the comment about high- and low-level combatants, so the 1997 country report just talks about high-level combatants. In our brief, we argue that Mr. Wass was not similarly situated to those individuals. And, again, it goes back to the failure to make an individualized determination. I think it would be much easier for a former president or an ambassador or a rebel leader like those mentioned in the 1997 country report to return because there's international scrutiny about when they return, what the government's doing to them, and whether it's persecuting them. And it would attract international attention and pressure in the same way that Mr. Wass, while returning, would not because he doesn't have that international notoriety. I think, again, it goes back to the- I want to argue both ways. He's a boxer, you said, and he would stand out. And now he's just- Do you? Do you want to argue both ways? Well, I think it's a perilous middle ground, actually, Your Honor, that, you know, on the one hand, so he's famous enough to attract their attention to get persecuted. But, on the other hand, he's not famous enough to attract kind of international attention. I understand. So unless the Court has questions, I'll save some time for rebuttal. Thank you. Thank you. May it please the Court. Eric Marsteller for the Attorney General. The basic issue in this case is that, based on the evidence and the arguments before it, did the Board reasonably conclude that the Department of Homeland Security established, by a preponderance of the evidence, changed circumstances in Uganda such that Waspa no longer had a well-founded fear of persecution upon his return? And we contend that the Board did make a reasonable conclusion, based on the evidence of changed country conditions in the State Department profile and report, indicating general amnesty available to individuals who had acted against the government under Amin and the other previous Ugandan governments. So opposing counsel argues that there's an inference that the 1997 presidential or the presidential amnesty reported in the 1997 report was superseded or withdrawn and that the 2000 amnesty that's reported in the 2007-2008 reports are, by their terms, not applicable to Mr. Waspa. What should we make of that? Let me start with the 2000 Amnesty Act. He cites language in his brief suggesting that it doesn't apply to post-1986 acts, but we don't think the Court can consider the 2000 Amnesty Act because it is not part of the administrative record. So it's not an exhaustion issue. It's a jurisdictional issue. Under 8 U.S.C. Section 1252, there's a provision that said the Court can only review what was in the administrative record, and there's nothing in the administrative record indicating the amnesty act expired. It seems different, though. I mean, it's not a fact or an article or a report. It's just a statement of law, and normally we would take judicial notice of that. Except the Court generally does not take judicial notice of foreign law. It's generally considered a fact and must be proven by the parties. Do you have a case on that point? I do, Your Honor. I don't know that I saw it in your briefing. It is Filt v. Macri, which is 261 F. 2nd, 945. The Court's en banc decision in Fisher also discusses that. And the Third Circuit has a decision discussing it in more detail called Abdeel v. Ashcroft, 242 F. 3rd, 477. And so generally, foreign law, as I said, is something that must be proven by the parties. And it also makes sense here in an administrative proceeding because the Board is reviewing the evidence and the arguments presented to it, and this Court is simply reviewing the administrative decision to make sure that it was proper. And there is no reason for the Board to believe that the 2000 Amnesty Act would not have applied to Mr. Waswa, nor necessarily believe that the earlier presidential amnesty would not still be applicable. And certainly, based on this Court's standard of review, the record does not compel the conclusion that Mr. Waswa would not have been covered by the earlier amnesty, absent some concrete evidence in the record. So I'm sorry, Your Honor, you had asked about the Amnesty Act. Did I answer everything? Yes, you did. Okay, thank you. Regarding the scope of review of this case, whether the Court is reviewing the Board's decision or the immigration judge's decision, honestly, we don't think it matters all that much in this case. The Court is reviewing the Board's reasons for finding that the Department of Homeland Security met its burden of proof. But implicit in the Board's, or actually explicit in the Board's regulations, is the Board cannot make factual findings on its own. Instead, it reviews the immigration judge's factual findings only to determine if they're clearly erroneous. So even if the Board said, as it did in this decision, that it was at a parenthetical indicating it was conducting de novo review, those are only of the immigration judge's judgments and legal conclusions, not its factual findings. As relevant to this case, for example, this is just an example, is the Petitioner testified that he was detained. He gave various versions of his account. He indicated that he was detained for a month and a half. He indicated that he was detained for 90 days. And later, he indicated he was detained for 10 days. The immigration judge found that he was detained for 10 days. And so the Board, unless it found that determination clearly erroneous, was relying on that factual finding of the immigration judge and all of the other factual findings made by the immigration judge, including findings related to some of the things that Petitioner has raised in his brief and argument, including the information from his sister that he still would be targeted if he returned. The immigration judge found that, although Mr. Waswell was credible, the immigration judge found portions of his evidence not especially persuasive, including the sister's claim that he would be harmed. After further examination, Mr. Waswell was simply saying that his sister believed that everyone who had been in the former regime's returning would be subject to harm. There was nothing individualized about Mr. Waswell himself, that he would be subject to any particular harm. Similarly, let me ask you in particular about the Board's decision, appears to accept not to reexamine the determination found by the immigration judge of past persecution. And our case law requires that the determination of changed country conditions on which the burden would fall to the government be conducted on a sufficiently individualized basis to refer to the particular petitioner. Where in the BIA's decision is there reference to the particular circumstances of the petitioner sufficient to satisfy that requirement? We believe that Mr. Waswell's circumstances were that he was someone in the military under the former regimes of Uganda. And the Board in its decision indicated that there was evidence suggesting that members, former members of the regime, former members of the military, would no longer have a well-founded fear of persecution because of the amnesty laws in effect since the 90s in that country. So the Board's decision referenced individuals who participated in the Amin and Aborto regimes, and we believe that that was sufficiently individualized to indicate that Mr. Waswell, who fit into that description, would also be covered by the, there was at least a preponderance of the evidence that he would be covered by the amnesties. We don't, this is where the question, whether the, what there was of individualized evidence, being the warnings via his sister, for example, which you spoke to, or his somewhat higher profile because of his activities as a boxer. Does the BIA address those in particular, or do we just accept the proposition that they knew about it but decided not to speak about it? Oh, the BIA did not explicitly talk about his alleged higher profile as a boxer. But again, going back to some of the other things, like the claim about his sister, the claim about his children, I wanted to mention that. The immigration judge found that that evidence was not particularly persuasive either, and Mr. Waswell initially said that he was asked if he had talked to his children, if they had been, heard of any threats against him. And he initially said no, he hadn't talked to them because they're too young. And then when the, on cross-examination, when he was asked, or I guess, I'm not sure who was asking him, but he was asked, well, they weren't too young because they're adults now, so have you spoken to them? And it was only after it was pointed out that they were adults did he change his testimony and say that no, he had talked to his sister and his sister had told him that they had received threats in 2005. So it's, again, kind of this loop of hearsay that gets to him, and the immigration judge found that the claims by the sister, the statements made by the sister, that they were not persuasive. So the board didn't need to address that individual circumstance regarding the children's statements. It didn't need to explicitly address the statements from the friends that his, another sister and brother-in-law had been murdered because the immigration judge also found that not especially persuasive. Again, it was while he was detained in immigration custody, Mr. Waswick claimed he was told by some unnamed friends that his sister and former brother-in-law had been killed at some point. When asked how they knew that information, Mr. Waswick conceded he didn't know how they knew that information. And the immigration judge in its decision concluded that that evidence was not persuasive. So those key facts that he says needed individualized analysis were all found unpersuasive by the immigration judge, so the board did not need to explicitly address them in its decision. So we believe that basically what the immigration judge found was that the 1986, that Mr. Waswick was persecuted in 1986 after he returned and was a member of the Musveni military. Most of the facts as to what happened after that, the immigration judge didn't find especially persuasive, and so the board didn't need to explicitly address them. So we believe that the board's decision is sufficiently individualized to pass muster under this court's jurisprudence. Those were my main points, Your Honors. If there's no further questions, the government will rest on its briefs. Thank you. Thank you, Your Honors. Mr. Countryman, rebuttal. Very briefly, Your Honor. On the issue about the sister and brother-in-law being murdered, the immigration judge never made a finding that that wasn't persuasive evidence, never considered that in his analysis of the rebuttal of a well-founded fear of future persecution. He mentioned the testimony and his fact findings, but he never assessed the impact of that on Mr. Waswick's claims. The board also never mentioned it. So that's one key piece of evidence specific to Mr. Waswick that was never considered by either the IJ or the board as part of its analysis. And, you know, with respect to the IJ, that's particularly problematic, because the IJ does say that Mr. Waswick has a brother and two children that are still living in Uganda, and the IJ uses that as a basis to say that Mr. Waswick, if he were to return to Uganda, would be safe. The two problems with that, first, there's no showing that Mr. Waswick was similarly situated to those individuals. And then, secondly, and more importantly, the IJ can, on the one hand, say that, you know, because some of these people are safe, that Mr. Waswick would also be safe, while, on the other hand, not analyzing the effect of the fact that two of his relatives were murdered on his claim. So for those reasons, we'd ask the court to grant the petition. Thank you. We thank you. We thank both counsel for your very well-presented arguments. The case just argued is submitted.
judges: Farris, Clifton, Ikuta